921 P.2d 178

Raymond D. McALPIN, SSN 325–50–0390, Claimant–Appellant,

v.

WOOD RIVER MEDICAL CENTER, Employer, and State of Idaho, Department of Employment, Defendants–Respondents.

No. 22205.

Supreme Court of Idaho,
Boise, May 1996 Term.

July 31, 1996.

Raymond D. McAlpin, Hailey, pro se appellant.

Michael F. Donovan, Ketchum, for employer-respondent.

TROUT, Justice.

This appeal arises from an order of the Industrial Commission finding the appellant ineligible for unemployment compensation benefits.

# I.

## BACKGROUND

Raymond McAlpin was employed by Wood River Medical Center (Wood River) in August of 1993 to work in its two hospitals as a respiratory therapist. Wood River has a written policy restricting access to patient medical records to only those instances where the patient has given proper consent or where a request is made under court order. In furtherance of this policy, Wood River has a procedure in place to process requests for medical records information that requires the submission of an authorized request form to the medical records department.

Beginning December of 1993, McAlpin began copying various patient medical records by hand without prior permission and without submitting the aforementioned request form. In February of 1994, Wood River's associate director of nursing, Karen Morrison, witnessed McAlpin photocopying patient records. A medical records department employee, Sandra King, also stated that on February 28, 1994, McAlpin told her that he had been making photocopies of information contained in certain patient charts to check his work. On March 14, 1994, McAlpin met with his immediate supervisor, Karen Exon (Exon), and the medical records manager, Sandra Ohman (Ohman), at which time he admitted photocopying records. McAlpin told Exon and Ohman that he did this to acquire information to support a grievance he had filed on February 18, 1994, regarding inadequate patient care at the hospital.

McAlpin finally was discharged on April 13, 1994, for violating patient confidentiality after Morrison witnessed him "flipping" through the Narcotic Record on the previous day. McAlpin applied for unemployment insurance benefits which were granted following a hearing before an Appeals Examiner of the Idaho Department of Employment. Wood River appealed this decision to the Industrial Commission which remanded the case back to the Department of Employment for a more complete record. A second hearing was held after which McAlpin again was granted benefits. Wood River appealed to the Industrial Commission which, on this second appeal, performed a *de novo* review of the record and issued an order reversing the decision of the Appeals Examiner. The Commission concluded that McAlpin was discharged for misconduct in connection with employment and that he was ineligible for unemployment insurance benefits. McAlpin appeals the Commission's order.

# II.

## STANDARD OF REVIEW

 When evaluating a decision by the Industrial Commission, our role is to review questions of fact only to determine whether substantial and competent evidence supports the Commission's findings. Idaho Const., art. 5, § 9; *Dewey v. Merrill,* 124 Idaho 201, 203, 858 P.2d 740, 742 (1993). We exercise

**4**

free review, however, over all questions of law. *Id.*

◼ Wood River argues initially that appellate review of the Industrial Commission's denial of benefits is inappropriate here because it has not been supplied with a reporter's transcript of the hearings, as required under I.A.R. 29, and that the burden of presenting an adequate record on appeal lies with the appellant. We note, however, that the transcript of both hearings before the Department of Employment were properly included in the Clerk's Record as exhibits. Accordingly, both documents are properly before the Court in compliance with the appellate rules and our review of the Industrial Commission's order is appropriate.

## III.

### FINDINGS OF FACT

The Commission's findings of fact in this case accurately reflect both Wood River and McAlpin's versions of the events leading up to McAlpin's termination which are, for the most part, in substantial agreement. It is agreed that, prior to beginning employment with Wood River in August of 1993, McAlpin attended an initial orientation given by the hospital. This orientation included a substantial segment on the importance of patient confidentiality. Within the general context of patient confidentiality, McAlpin also recognized the reasonableness of strict rules within a facility restricting employee access to patient information. Fairly soon after commencing employment at Wood River, however, McAlpin began making handwritten copies of patient records and, at some point, commenced photocopying selected charts of both currently hospitalized patients as well as those recently discharged.

A memorandum outlining the proper procedure for requesting a patient's chart was circulated on October 19, 1993, along with request forms designed for this purpose. Exon, McAlpin's supervisor in the respiratory therapy department, testified that the memorandum was posted in the department and discussed in a meeting with all staff members. She further asserted that McAlpin signed off in a communication log that he

was aware of the whereabouts within the department of the medical records request forms. McAlpin neither substantiated Exon's testimony regarding the memorandum nor did he contradict it at the hearing. McAlpin did not use the medical record request form to access the patient charts he copied.

Both parties agree that King, the medical records clerk, arrived at her office on the morning of February 28, 1994, to find that several charts on her desk the afternoon before were missing. Some minutes later McAlpin entered the department to return the missing charts. On March 3, McAlpin returned to the medical records department and questioned King regarding Wood River's protocol for obtaining patient charts. Ohman, the medical records department manager, arrived at the department during this discussion and McAlpin then began "quizzing" her on the subject. Ohman advised McAlpin that the only way he could make copies of patient charts was pursuant to a valid quality assurance study that was approved by his department supervisor. McAlpin subsequently met with Exon and Ohman where he admitted to photocopying records in order to document points raised in a grievance he had filed. McAlpin again was told at this meeting that he could not copy patient information even to support a grievance. Exon and Ohman also requested that McAlpin return the copied information. McAlpin informed them that he had abstracted the information derived from the charts and destroyed the copies he had made.

◼ The only testimony given at the hearings that is directly contradictory on any salient issue is King and McAlpin's versions of the February 28, 1994, incident. King maintained that, when McAlpin came into medical records bearing the missing patient charts, she asked him what he was doing and he responded that he was making copies to check his work. King was somewhat nonplussed by McAlpin's statement and told him that copying records "was wrong, that he had to go through the right channels to get records." McAlpin contended, on the other hand, that King was not agitated in the least that he had taken the patient charts from

medical records and that King told him that he "didn't need any type of consent" to do so.

The Commission ultimately found King's version of the February 28 incident to be more persuasive noting, in its conclusions of law, that McAlpin had "ignored at least two warnings that unilaterally copying medical records was inappropriate," referring to the February 28 and March 3 incidents. This Court will not displace the Commission's findings of fact if they are supported by substantial though conflicting evidence. *Davis v. Howard O. Miller Co.*, 107 Idaho 1092, 1094, 695 P.2d 1231, 1233 (1984) (citing *Meyer v. Skyline Mobile Homes*, 99 Idaho 754, 589 P.2d 89 (1979)). The weighing and evaluation of conflicting testimony is left to the sound discretion of the Commission and will not be disturbed on appeal unless clearly erroneous. *Ross v. Tupperware Mfg. Co./Premark*, 122 Idaho 641, 643, 837 P.2d 316, 318 (1992).

Although the Industrial Commission was not able to "observe and judge the demeanor of the witness[es]" in this case, *id.*, the Commission's resolution of this conflict is sound. The medical records department is responsible for holding all patient charts after discharge from the hospital. The ability to find a particular patient record at any given time after discharge is essential both for follow-up care and for potential rehospitalization. Disorder in this department simply cannot be tolerated. King arrived at the department early on the morning of February 28, however, to find her normally-locked office door ajar and several patient charts missing. McAlpin maintained that King was not at all concerned about the missing charts and further advised him that if "no one is here, you can come and get [the charts] yourself. Just make sure that you put them back." A flippant disregard of the whereabouts of vital patient records by an employee of this department is clearly inconsistent with an ordered system for which any hint of disarray is anathema. Accordingly, we find the Commission's resolution of this testimonial conflict to be sound.

The remainder of McAlpin's contentions regarding the Commission's findings of facts are similarly unfounded. In each instance of alleged error, there is substantial and competent evidence supporting the Commission's findings. For example, although McAlpin told Exon of his intent to monitor patient care, that fact does not estop Wood River from objecting to McAlpin making copies of patient charts to do so. Exon undoubtedly assumed McAlpin would take notes on the relative effectiveness of his treatments with current patients; her approval of this accepted method of patient care monitoring cannot be viewed as an acquiescence to McAlpin's informal, intrusive, and clearly unauthorized quality assurance study.

McAlpin also maintains that the recordings/transcripts of the two hearings conducted before the appeals examiner are flawed and resulted in a defective review of the testimony by the Commission. We find, however, that the recordings of the testimony, although imperfect, are audible and that the transcript reasonably reflects their substance.

We thus affirm the Commission's findings of fact as supported by substantial and competent evidence. Although McAlpin's interpretation of the testimony is at times arguable, it is not the function of this Court to conduct a *de novo* review of the factual findings of the Commission.

## IV.

### CONCLUSIONS OF LAW

McAlpin nevertheless maintains that, even given the Commission's factual findings, his actions should not be considered misconduct for which unemployment compensation can properly be denied.

The policy of this state is that unemployment reserves are provided for the benefit of those persons who find themselves unemployed "through no fault of their own." I.C. § 72–1302. To be eligible, therefore, an unemployed claimant must not have been discharged for "misconduct" in connection with his employment. I.C. § 72–1366(e). Misconduct for which unemployment compensation benefits can be denied includes (1) willful and intentional disregard of the em-

ployer's interests; (2) deliberate violation of the employer's rule; or (3) disregard of standards of behavior that the employer has a right to expect of his employees. *Johns v. S.H. Kress & Co.*, 78 Idaho 544, 548, 307 P.2d 217, 221 (1957).

The Industrial Commission found in this case that there was neither a willful and intentional disregard of the employer's interests nor a deliberate violation of the employer's rule. In determining whether an employee's actions demonstrate a disregard of standards of behavior that his employer has a right to expect of him, a two-pronged test is applied that inquires whether (1) the employee's conduct fell below the standard of behavior expected by the employer; and (2) whether the employer's expectation was objectively reasonable. *Matthews v. Bucyrus–Erie Co.*, 101 Idaho 657, 659, 619 P.2d 1110, 1112 (1980). Unless an employer's expectations can be considered to "flow naturally" from the employment relationship itself, however, they must be communicated to the employee before they can serve as a proper basis for a charge of misconduct. *Davis*, 107 Idaho at 1094, 695 P.2d at 1233. The question then is whether the employee has breached "a standard of behavior that would flow normally from an employment relationship or which was communicated to [the employee] because of its uncommon nature." *Wulff v. Sun Valley Co.*, 127 Idaho 71, 75, 896 P.2d 979, 983 (1995).

In this case, McAlpin was discharged from his employment for copying patient records and for reading the Narcotic Record, actions Wood River considered tantamount to violating patient confidentiality. Although the evidence adduced at the two hearings clearly indicates that McAlpin's actions fell below the standard of behavior required by Wood River, the more important question is whether the behavior expected of McAlpin was either properly communicated to him or "flowed naturally" from the employment relationship.

As a trained respiratory therapist, McAlpin was well aware of the importance of patient confidentiality in the hospital setting. McAlpin further acknowledged that, by an extension of this fundamental tenet,

hospital protocol that strictly controls access to patient records, particularly by hospital employees, is both sound and reasonable. The importance of this principle was echoed during McAlpin's initial orientation to Wood River. Nevertheless, McAlpin pleads ignorance to the logical corollary to these rules and argues that his copying of charts does not violate patient confidentiality. We note in this context, however, that Wood River is directed by law to formulate a policy restricting access to patient records to authorized persons. *See* IDAPA 16.03.14.360. Although health professionals employed in a hospital setting must be given access to the records of current inpatients in order to facilitate treatment, that necessity ceases once the patient has been discharged. At that point, the exigencies of providing care are no longer extant and access to patient information, even by employees of the hospital, is appropriately restricted. A limitation on employee access to patient information should apply equally to current inpatients whose privacy interest, although compromised by their need for care, is not abrogated totally when they consent to treatment.

McAlpin maintains, however, that he copied portions of the patient charts to support a grievance related to patient care. That fact does not excuse the claimant's actions. Allowing a hospital employee to peer into any patient's record without first obtaining authorization from a supervisor to do so, even to support a grievance relating to patient care, is an unwarranted intrusion that easily could expose the facility to potential liability. Investigation of patient care matters is the proper prerogative of a hospital's quality assurance department which has the means to minimize any encroachment on a patient's privacy in the process of improving the overall quality of care.

We thus find that the conduct Wood River expected from McAlpin, the dereliction of which served as the basis for his discharge, was objectively reasonable and "flowed naturally" from the employment relationship. In addition, even if the medical center's limitation on patient record access to employees does not follow logically from the principle of patient confidentiality, McAlpin fully ac-

knowledged the reasonableness of extending this policy to hospital employees, a point that was emphasized during McAlpin's initial orientation. Furthermore, the October memorandum circulated to all departments unambiguously gave notice to all Wood River employees that unauthorized copying of patient charts was not permitted. This memorandum, posted in McAlpin's department, described the exact procedure to be followed when any patient information was requested from medical records. King reiterated the hospital policy on February 28 when she strenuously objected to McAlpin's pulling charts from medical records without prior authorization and this was further driven home by Ohman on March 3 followed by both Ohman and Exon on March 14.

McAlpin argues, however, that the record indicates that he did not copy any records in March and, hence, he did not breach the employer's standard of behavior once it was communicated to him. McAlpin's position that he did not copy patient records after the facility's position was communicated to him is untenable in light of the October memorandum. Moreover, the Commission's findings that McAlpin continued to copy records after he was verbally warned on two separate occasions is not clearly erroneous in light of the testimony given at the hearing.

Finally, we should note here that, although McAlpin's perusal of the Narcotic Record might not, by itself, be a reasonable basis for a finding of misconduct, that occurrence cannot be viewed in isolation. McAlpin had already admitted to several members of Wood River's management team that he had violated patient confidentiality by copying patient charts. It certainly was not unreasonable for his employer, at that point, to view McAlpin's actions in "flipping" through the Narcotic Record as a further example of McAlpin's total disregard for the privacy of the hospital's patients.

We thus affirm the order of the Industrial Commission. The Commission applied the correct law to its findings of fact in concluding that McAlpin was discharged for misconduct in connection with employment and is, as a result, ineligible for unemployment insurance benefits. Unauthorized copying of patient records was conduct that fell below the standard of behavior that Wood River reasonably should have expected from McAlpin which, even if not patently obvious, was adequately communicated several times prior to McAlpin's discharge and was repeatedly ignored.

## V.

## ATTORNEY FEES

Wood River has requested attorney fees on appeal. The only provision for awarding attorney fees in a worker's compensation case is I.C. § 72–804. This statute gives the Commission or a court discretion to award attorney fees to the claimant if the employer or surety contests a claim for compensation "without reasonable ground." This section does not allow an award of fees to be made against the claimant. *Challis v. Louisiana–Pacific Corp.*, 126 Idaho 134, 138–39, 879 P.2d 597, 601–02 (1994). We are thus not authorized to award attorney fees to Wood River on this appeal.

## VI.

## CONCLUSION

The Industrial Commission's findings of fact are supported by substantial and competent evidence and its conclusions accurately reflect the appropriate legal standard. The Commission's order denying unemployment compensation benefits to the appellant is thus affirmed. Attorney fees are unavailable to the respondent for defending this appeal. We will, however, award Wood River its costs.

McDEVITT, C.J., and JOHNSON, SILAK and SCHROEDER, JJ., concur.